Marc **SHERMAN** and Paul **Willensky** (d/b/a Wilsher Partners), Plaintiffs,

v.

Mark **SOKOLOFF** and Rosenberg Commodities, Inc., Defendants.

No. 80 Civ. 6237 (WK).

United States District Court, S.D. New York.

Sept. 12, 1983.

Cadwalader, Wickersham & Taft, Earl H. Nemser, Peter G. Bergmann, H. Peter Haveles, Jr., New York City, for plaintiffs.

Gaston, Snow, Beekman & Bogue, Martin P. Unger, Eva Posman, New York City, for defendants Rosenberg Commodities.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

This is an action under the antifraud provisions of the Commodity Exchange Act, 7 U.S.C. §§ 6b, 6o, and a regulation promulgated thereunder. 17 C.F.R. § 166.3 (1982). The case is before us on defendant Rosenberg Commodities' (Rosenberg) motion for summary judgment. For reasons stated below the motion is GRANTED.

## BACKGROUND

In this procedural posture we view the record as establishing the following material facts. Plaintiffs Sherman and Willensky are in the business of advising, managing, and making investments in commodity futures for themselves and for third parties. Wishing to trade in platinum futures, but having themselves had no immediate trading experience in that metal, they engaged defendant Sokoloff to do so on their behalf. Sokoloff, a registered floor broker, had been recommended to plaintiffs by a person unrelated to defendant Rosenberg as having had experience in trading platinum futures. In August of 1980 plaintiffs entered into a partnership agreement with Sokoloff regarding a platinum futures account which he would trade. The written agreement gave Sokoloff unrestricted authority to manage the account and provided for his compensation a fixed annual salary plus a percentage of the account's profits. In addition to making the written contract, the partners agreed *orally* that Sokoloff would be constrained in the management of the platinum account in ways that were intended to curb the potential for losses.[1]

At Sokoloff's behest the platinum account—capitalized to the tune of $50,000 —was opened with Rosenberg Commodities, a futures commission merchant (FCM) with whom Sokoloff had previously dealt.[2] Rosenberg was not advised about the oral trading restrictions to which Sokoloff had agreed with his partners. Trading in the account began on August 25, 1980 and the partners "contemplated a full review of Mr. Sokoloff's performance and trading for the account after the first full month of trading ended on September 30, 1980." Sherman Affidavit ¶ 8. Alas, the relationship did not last that long.

During the following weeks Rosenberg regularly mailed to plaintiffs daily transaction confirmation statements and equity statements, the latter showing the positions in the account and their individual and total value at the end of the respective trading day. And then came the fateful week of September 22, 1980.

On the morning of Thursday, September 25, plaintiffs received in the mail a $9,300 margin call which had been incurred the previous Tuesday, September 23. Rosenberg's practice was to mail margin calls on the next day after they were incurred, on receipt of the appropriate information from a computer accounting service. The margin request which the plaintiffs received in the mail on September 25 suggested that Sokoloff had exceeded his oral restrictions and, accordingly, plaintiffs immediately called their partner for an explanation. Whatever explanation was proffered seemed to satisfy them that all was in order, because they did nothing to curb Sokoloff's power to trade. On that very day, however, Sokoloff lost almost $80,000, which resulted in yet another margin call of some $54,000. The next day, September 26, Sokoloff lost an additional $217,000, prompting another margin call of about $145,000. The platinum account had posted a total loss of almost $300,000 by the end of trading on Friday, September 26. The precise extent of the losses had become apparent by the following Monday, September 29, at which time plaintiffs tendered a check to Rosenberg for $145,000 to cover the balance due. Shortly thereafter plaintiffs severed their relation with Sokoloff, and started this action to recover the $300,000.

We also regard it as established that, although Alan Rosenberg—Rosenberg Commodities' sole employee—occasionally assisted Sokoloff with the mechanics of trading, no jury could reasonably find that Sokoloff was employed by Rosenberg or that Rosenberg had any authority to trade the ill-fated

---

1. The details of the oral restrictions are not germane to this motion. *See also* note 7, *below*.

2. Much ink has been spilled on the question whether Rosenberg was a clearing broker or a futures commission merchant (FCM) with respect to the platinum account. The evidence raises, at least, an issue of fact on this question. Accordingly, for purposes of this motion we regard Rosenberg to be a FCM. *See* 17 C.F.R. § 1.3(d) (1982) (definition of "clearing organization") and § 1.3(p) (definition of FCM).

platinum account.[3] Moreover, the evidence shows that Sokoloff knew Alan Rosenberg personally before August 1980, but there is no evidence to suggest that Rosenberg seduced Sokoloff into opening this particular account with it or that Rosenberg knew about trading requirements or investment objectives peculiar to the account at issue.

There is, finally, much dispute about the role and status of William Cameron, a floor broker who substituted for Alan Rosenberg—apparently without direct compensation—on the days the latter was not at work.[4] The evidence described in ¶¶ 23 and 25 of the Bergmann Affidavit indicates that Cameron may have had a jaundiced view of Sokoloff's abilities.[5] We will impute such views to Rosenberg. Accordingly, we take it as established that Alan Rosenberg would not have recommended Sokoloff to plaintiffs had they asked him to express an opinion. The totality of Cameron's testimony allows, however, no further reasonable inference.

3. The only authority Rosenberg derived from plaintiffs' agreement with it was the limited one—set forth in ¶ 8—to cancel purchase orders or make sales in the event of distress. As there is no suggestion that such power was exercised, the agreement is immaterial to the present decision.

4. In particular Cameron "filled in" on September 25 and 26, when Rosenberg was absent for religious reasons. The evidence shows that plaintiffs spoke to Cameron during Friday, September 26—after they had been alerted by Sokoloff about the results of the day's trading—and asked him to determine the extent of the losses. The "ballpark" figure Cameron promptly gave them later proved to be inaccurate. The precise amount was established over the weekend.

5. Cameron testified that, in his view, Sokoloff did not usually have an accurate count of his positions. Exhibit C (Cameron Dep.) to Bergmann Affidavit at 83. He testified further that, "compared to [Cameron's] particular way of trading," Sokoloff was "trading over his head"—taking positions that were larger than the equity in the account and market conditions warranted. *Id.* at 100, 200. However, he testified that his views as to the wisdom of certain positions might not be shared by another trader, *id.* at 99, and also stated that he "had no knowledge as to [Sokoloff's] basic skills for trading commodities." Exhibit D (Cameron Dep.) to Posman Reply Affidavit at 78.

## DISCUSSION

### The Fraud Claim

Plaintiffs bring two separate counts against Rosenberg, which counts we regard as identical for purposes of this motion. One alleges that plaintiffs were defrauded by Rosenberg's failure "to exercise diligent supervision" of the trading in the platinum account. Complaint ¶ 54. The other alleges that the self-same failure "aided and abetted" Sokoloff's fraud. Complaint ¶ 63. The parties' vitriolic submissions have been more spirited than enlightening. Accordingly, it is not immediately apparent precisely what is the nature of the fraud Rosenberg is alleged to have committed.[6] As we cull it from their papers, the focus of plaintiffs' charge is that, by his daily observation of Sokoloff, defendant must have learned about Sokoloff's "intrinsically fraudulent" trading but took no steps to alert them about such fraud.[7] Plaintiffs

6. This is certainly not the run-of-the-mill commodities fraud claim. We are not dealing with the misappropriation of customer funds, *CFTC v. Muller* (5th Cir.1978) 570 F.2d 1296; with a "boiler room" operation, *CFTC v. U.S. Metals* (S.D.N.Y.1979) 468 F.Supp. 1149; with a misleading price prediction, *D.F.P. Int. v. Hoffman* (CFTC 1979) [1977–1980 Trans. Binder] Comm. Fut.L.Rep. (CCH) ¶ 20,775; or performance record, *Reese v. Pattison* (CFTC 1983) 2 Comm. Fut.L.Rep. (CCH) ¶ 21,689. Nor is this a churning case, *Booth v. Peavey Co.* (8th Cir. 1970) 430 F.2d 132, *Shelley v. Noffsinger* (N.D. Ill.1981) 511 F.Supp. 687; a case of unauthorized transactions, *Haltmier v. CFTC* (2d Cir. 1977) 554 F.2d 556; of misrepresentation as to the risk of commodities trading, *Sturcker v. Clayton* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,727, *Vetrono v. Ace American* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,-726, *Wilke v. Winchester Trading* (CFTC 1977) [1977–1980 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,605; or one dealing with the proverbial guarantee of "no loss", *Kupser v. Chartered Syst.* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,717.

7. As plaintiffs conceded in oral argument and as their submissions make abundantly clear, *see, e.g.,* Plaintiff's Memorandum at 16, 17, the oral restrictions on Sokoloff's trading are "not an issue" germane to the claims they assert against Rosenberg, whose duty to inform plaintiffs about Sokoloff's "inherent" fraud is con-

claim, in particular, that they should have been advised about the *intra-day* pattern of Sokoloff's trading because the daily reports "only provided a snapshot of the positions ... at day's end," and were, accordingly, "no help" in discerning Sokoloff's fraud. Plaintiff's Memorandum at 9; Sherman Affidavit ¶ 7.[8] Plaintiffs fail to demonstrate, however, that Rosenberg had a duty—the willfull or reckless breach of which may be tantamount to fraud—to advise them of Sokoloff's intra-day activities.

Plaintiffs describe *Rolf v. Blyth, Eastman Dillon & Co.* (2d Cir.1978) 570 F.2d 38, *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 as the "most instructive decision" regarding Rosenberg's liability for failure to advise them of Sokoloff's trading pattern.[9] *Rolf,* however, is altogether distinguishable. That was an unsuitability case against an investment advisor and a broker. The broker—to whom Rosenberg is compared—was held liable for fraud on a finding that he had *repeatedly given assurances* to the plaintiff about the wisdom of the advisor's investment decisions, in reckless disregard of whether those assurances were true or false. *Rolf, supra,* 570 F.2d at 44. Indeed, the broker in *Rolf* might well have known that his assurances were false because he "either recommended or was somehow involved in the decision to purchase" several "highly speculative" securities. *Id.* at 42. By no stretch of plausible argument can Rosenberg's part in this case be analogized to the role of the broker in *Rolf.*[10]

In light of the prominence of the *Rolf* decision in plaintiff's argument, it is

tended to be independent of those restrictions. Thus, we regard the fact that those restrictions were never communicated to Rosenberg as the only relevant datum concerning the oral limitations. Their possible breach is not before us on this motion.

8. There is conflicting evidence whether or not the daily reports could have been used to detect Sokoloff's alleged trading excesses. In light of our ruling we shall assume, *arguendo,* that persons even as sophisticated as these plaintiffs, *compare Holmes v. Bateson* (1st Cir.1978) 583 F.2d 542, 552 (unsophisticated plaintiff) *with Hirsch v. duPont* (2d Cir.1977) 553 F.2d 750, 762–63 (sophisticated plaintiff), could not have inferred from the daily reports that something was amiss. We also reject, *arguendo,* defendant's contention—*see* Defendant's Memorandum at 42–44—that plaintiffs' alleged failure to inspect those reports constitutes such inattention to their own affairs as should debar them from recovering. *See Mallis v. Bankers Trust Co.* (2d Cir.1980) 615 F.2d 68, 78–79 (under Rule 10b–5), *cert. denied* (1981) 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109. *See, generally,* M. Helman, *Rule 10b–5 Omissions Cases and the Investment Decision,* 51 Fordham L.Rev. 399, 406–08 (1982); *id.* at 401 n. 16 (citing sources).

9. The only other case cited by plaintiff is *Faturik v. Woodmere Securities, Inc.* (S.D.N.Y. 1977) 431 F.Supp. 894. That was a churning case before Judge MacMahon on a motion to dismiss. Although the Judge had serious doubts about the soundness of the claim against the broker who merely executed trades, he refused to let it "off the hook" on such scant record as was then before him. Neither *Rolf* nor *Faturik* are, of course, commodity cases. That, however, is not a ground on which their precedential value flounders. "Courts have consistently held that case law developed under the securities laws is pertinent to cases under the [Commodity Act]." *CFTC v. U.S. Metals* (S.D.N.Y.1979) 468 F.Supp. 1149, 1152 n. 5 (Weinfeld, J.) (citing cases).

10. Plaintiffs suppose that much of the weight of their argument is carried merely by the conclusion that Rosenberg, as FCM, was an "agent" of plaintiffs. *See, e.g.,* Bergmann Affidavit ¶ 28. To be sure, the FCM is indeed an agent of the client and owes him, accordingly, a fiduciary duty. *See, e.g., Monette v. Premex, Inc.* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,733 at 26,882 (citing cases); *Graves v. Shearson, Hayden Stone* (CFTC 1981) [1980–1982 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,301 at 25,521. *Cf. Schenck v. Bear, Sterns & Co.* (S.D.N.Y.1979) 484 F.Supp. 937 (securities brokers). That conclusion, however, does not end the inquiry, it merely frames it. The question is, "What is the scope of the agency?" We would have no hesitation to conclude that the FCM owes his client a fiduciary duty in the performance of the activities described in 17 C.F.R. § 1.3(p) (1982)—taking orders, executing trades, dealing with customer funds. *See, e.g.,* 17 C.F.R. §§ 1.20–1.28 (1982) (obligations regarding customer funds). However, the status of FCM and the attendant fiduciary duties do not—in and of themselves—support the imposition of the broad duty of supervision and reporting which plaintiffs seek to impose on Rosenberg. *Cf. Robinson v. M.L.P.F. & S., Inc.* (N.D.Al.1971) 337 F.Supp. 107, 110–14, *aff'd mem.* (5th Cir.1972) 453 F.2d 417.

disturbing that counsel failed in its brief to call our attention to a subsequent chapter in that saga, *Rolf v. Blyth, Eastman Dillon & Co.* (2d Cir.1980) 637 F.2d 77 (on appeal from remand). There the Court of Appeals specifically noted an amendment to the original *Rolf* opinion, which amendment explicitly disavows the broad reading of *Rolf* which plaintiffs press in their submissions. The Court stated that *Rolf*

> does not impose liability on a broker-dealer who merely executed orders for "unsuitable" securities made by an investment advisor vested with sole discretionary authority to control the account. In the present case, the broker-dealer, although charged with supervisory authority over the advisor and aware that the advisor was purchasing "junk," actively lulled the investor by expressing confidence in the advisor without bothering to investigate whether these assurances were well-founded. *Rolf, supra,* 637 F.2d at 80–81.

As applied to this case, every material element mentioned in the foregoing quotation points to the conclusion that Rosenberg is not liable. He executed orders for Sokoloff who had sole authority to manage the platinum account; he had no supervisory authority over Sokoloff, *see* discussion *below;* and he certainly did not "actively lull" plaintiffs, as did the broker in *Rolf.* Our own research has located no case where a broker (or FCM) in Rosenberg's position has been saddled with the obligation of monitoring and reporting the trading pattern of a person in no way affiliated to him, let alone a partner of plaintiffs. We decline the invitation to impose such a duty.[11]

■ Plaintiffs also intimate that Rosenberg's fraud can be predicated on his failure immediately to advise them (by telephone or telegram) about the September 25 margin call. Such advice, it is argued, would have put them on notice that something was amiss and would, accordingly, have allowed them to prevent the September 26 losses.[12] Sherman Affidavit ¶ 14; Plaintiffs' Memorandum at 15. Plaintiffs assert that it is "industry practice" for margin calls to be made by telephone prior to the opening of trading on the next business day, and that it was Rosenberg's practice to make telephone requests for "larger" margin calls.[13] Nowhere is it demonstrated, however, that the alleged violation of an uncodified industry practice (or personal business practice) can—in and of itself—subject Rosenberg to liability for fraud.[14]

**11.** *Cf. Stock v. Lincolnwood Comm.* (CFTC 1978) [1977–1978 Trans. Binder] Comm.Fut.L. Rep. (CCH) ¶ 20,729 (FCM not obligated to put stop orders into effect on its own); *Friedman v. Dean Witter* (CFTC 1977) [1977–1978 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,539 (disclosure to agent of plaintiff in charge of account satisfies obligation to report); *Piccioli v. Rosenthal* (CFTC 1979) [1977–1978 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,927 (erroneous advice by FCM where account nondiscretionary is not actionable).

**12.** It is established that plaintiffs did not stop Sokoloff from trading as a result of the $9,300 margin call of September 23, which they received in the mail on September 25. We have no occasion to consider defendant's argument that such failure—in and of itself—debars plaintiffs from recovery; rather, we assume for purposes of this motion, that the margin call of September 25 would have been sufficiently large to prompt plaintiffs to a more searching inquiry before the start of trading on September 26 than the one they conducted on September 25 as a result of the September 23 margin call.

**13.** The factual predicate of this claim—whatever its legal merit—remains unproven. The contention is that there exists a practice to inform clients about margin calls (by telephone or otherwise—the method is immaterial) before the start of the next business day. On the assumption that Exhibit D to the Bergmann Affidavit—a page from a text on commodity futures trading published by the New York Institute of Finance—is sufficiently authoritative to reflect industry practice, that page can be read as stating that margin calls should be made by telephone, but not that they are, indeed, made before the opening of the next day's business. Similarly, as to Rosenberg's practice we are offered his deposition to the effect that he phones for margin calls; but we are vouchsafed nothing about when such calls are made.

**14.** The soundness of such claim is particularly improbable it being the central purpose of margin calls to protect the broker, not to give notice to customers about the result of trading. Plaintiffs' reliance on *Geldermann & Co. v. Lane Processing, Inc.* (8th Cir.1975) 527 F.2d 571 for the proposition that margin calls are

*Cf. Matheson v. White Weld* (S.D.N.Y.1971) 53 F.R.D. 450, 452–53 (failure to live up to "minimum standard" in industry does not rise to level of statutory violation); *DaCruz v. Shearson* (CFTC 1979) [1977–1980 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,922 (not a breach of fiduciary duty to give only written, rather than written and oral, confirmations). Moreover, we have been referred to no regulation requiring such immediate notification, *cf.* 17 C.F.R. § 1.33 (1982) (prescribing time limits for notification on monthly and confirmation statements), nor does the Rosenberg Customer Agreement demand it. *Cf. Cortlandt v. E.F. Hutton* (S.D.N.Y.1979) 491 F.Supp. 1, 4 (violation of a written margin agreement does not amount to fraud); *Monette v. Premex, Inc.* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,733 (breach of fiduciary duty to represent to customer that FCM had obligation to contact him about maintaining margin when agreement stated it was customer's "sole responsibility" to do so); *Emmons v. M.L.P.F. & S., Inc.* (S.D.Ohio 1982) 532 F.Supp. 480 (no private right of action implied from violation of statutory and regulatory margin provisions); *Russo v. Bache* (N.D.Ill.1982) 554 F.Supp. 613 (no implied right of action for violation of commodity exchange rules).

### Regulation 166.3

■ Plaintiffs argue that they are entitled to recover from Rosenberg because he violated 17 C.F.R. § 166.3 (1982) by allowing Sokoloff to trade as he did.[15] However, Rosenberg's duties under § 166.3 do not include supervising an unaffiliated individual like Sokoloff. Accordingly, this claim must also fail.

There being no evidence that Sokoloff was an employee or partner of Rosenberg,

plaintiffs' position boils down to the contention that § 166.3 should be read in the disjunctive—*i.e.,* that it imposes a "general" duty of supervision (which Rosenberg is alleged to have violated) and a separate duty to supervise employees. This argument is without merit. First, the very language of § 166.3—by its reference to "all *other* activities"—makes this interpretation implausible. Second, it is altogether clear from the releases accompanying the proposal and later adoption of § 166.3 that its purpose is to insure that *employees* are properly supervised, not to impose a general duty to police the trading in every account carried by the FCM. For example, the release accompanying the adoption of § 166.3 states that

> The basic purpose of [§ 166.3] is to protect customers by ensuring that their dealings with the *employees* of Commission registrants will be reviewed by *other* officials in the firm. CFTC Notice (7/19/78) [1977–1980 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,642 at 22,624 (emphasis added).

The "evil to be remedied" is described in the release proposing what ultimately became § 166.3 as the "high proportion of inexperienced *employees* [which makes] close supervision particularly important." CFTC Notice (9/6/77) [1977–1980 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,474 at 21,934 (emphasis added). *See also id.* at 21,933 ("high rate of *employee* turnover") (emphasis added). *Cf.* 17 C.F.R. § 240.15b 10–4 (1982) (under the Securities Exchange Act). Thus, § 166.3 does not offer an alternative basis for holding Rosenberg liable for his failure to supervise the trading of plaintiffs' partner.

### CONCLUSION

Defendant Rosenberg's motion for summary judgment is granted. Accordingly,

---

intended to protect customers is entirely misplaced. The *Geldermann* Court specifically observed—in upholding the enforceability of a liquidation provision in a customer agreement—that such benefits as accrue to the public from liquidation (and margin) provisions are wholly derivative, and flow from the financial soundness of brokers (or FCMs) which such provisions insure. *Id.* at 577.

**15.** The relevant language reads:

§ 166.3 Supervision

Each Commission registrant ... must diligently supervise the handling of all commodity interest accounts carried, operated, or advised by the registrant and all other activities of its partners, officers, employees and agents ... relating to its business as a Commission registrant.

counts 5 and 6 are dismissed. A conference will be held on Thursday, October 6, 1983 at 4:30 p.m. in Courtroom 619 to discuss the future of this litigation against defendant Sokoloff.

SO ORDERED.