**BALFOUR MACLAINE, INC.**

v.

**NATIONAL COIN EXCHANGE, INC.**

**Civ. A. No. 87–6184.**

United States District Court, E.D. Pennsylvania.

April 20, 1988.

Abraham Reich, Philadelphia, Pa., for plaintiff.

David Marshall, Norristown, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

The plaintiff brought this action to recover $66,558.20 it claims the defendant owes it as a result of plaintiff's trading silver futures on defendant's behalf pursuant to a commodity account. The defendant has filed a counterclaim alleging that the plaintiff not only breached certain fiduciary obligations it owed to defendant while acting as its agent but also omitted certain material facts and made certain material misrepresentations and is, therefore, not only responsible for the $66,558.26 but in fact owes defendant $40,000.00. The case was tried to the court sitting without a jury.

The court makes the following Findings of Fact:

1. Plaintiff, Balfour Maclaine, Inc. ("Balfour"), is a New York corporation with its principal place of business located at Wall Street Plaza, New York, NY 10005.

2. Balfour is a brokerage firm which is authorized to trade in, among other things, commodity futures.

3. Balfour also acts as a "futures commission merchant" ("FCM"). For the purposes of this action, we define a futures commission merchant in accordance with the Commodity Exchange Act as follows:

> The words "futures commission merchant" shall mean and include individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to bargain, guarantee, or secure any trade or contracts that result therefrom.

7 U.S.C.S. § 2.

4. Defendant, National Coin Exchange, Inc., ("National Coin"), is a Pennsylvania corporation, with its principal place of busi-

ness located at 129 W. DeKalb Avenue, King of Prussia, Pa. 19406.

5. National Coin is in the business of buying and selling precious metals, including silver.

6. Robert Euler ("Euler") is President of National Coin and is its Chief Executive Officer in charge of its day-to-day business.

7. Euler has been involved in the silver futures market for 10 years. Euler has a screen in his office which quotes the actual performance of spot silver at any given time during market hours. Euler uses this screen to keep in daily contact with the spot silver market.

8. In 1980 Euler, on behalf of National Coin, opened a corporate commodity account with Clayton Brokerage Co. of St. Louis, Inc. ("Clayton").

9. In opening the account with Clayton, Euler, on behalf of National Coin read and signed a "Customer Risk Disclosure Statement." That statement was furnished pursuant to Rule 1.55 of the Commodities Futures Trading Commission. The statement provided, *inter alia:*

> The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:
>
> (1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional market funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.
>
> (2) Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur,

for example, when the market makes a "limit move".

> (3) Placing contingent orders, such as a "stop-loss" or "stop-limit" order, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders...."

Euler testified that at the time he signed this statement, he was aware of paragraph three and appreciated the risk involved.

10. In 1980, Euler and National Coin traded silver futures through Clayton and lost money in doing so.

11. In October, 1983, Euler opened a personal commodity account with Clayton. Euler indicated on his Customer Application that, at the time, his annual income exceeded $50,000, his liquid net worth exceeded $100,000, his other net worth totalled $300,000 and he owned real estate valued at $900,000. Euler once again read and signed a "Customer Risk Disclosure Statement" which contained the identical provisions noted in Finding of Fact # 9.

12. In October, 1983, Euler traded silver futures through Clayton and again lost money in doing so.

13. Between 1983 and 1987, Euler did not trade in silver futures.

14. In 1987, Clayton was sold and its accounts were transferred to other brokerage houses, including Balfour.

15. Reg Regis ("Regis") had been employed by Clayton for a number of years prior to the time it was sold in February of 1987. After Clayton was sold, Regis joined Balfour where he was employed as a broker.

16. Euler testified that "some five to six months prior to April, 1987," Regis, on behalf of Balfour, contacted National Coin and Euler by telephone. Euler testified that during the telephone conversation, Regis told Euler that he (Regis) would like to do commodity business with Euler. Euler testified that he responded that he was not interested in doing commodity business at that time.

17. Euler testified that Regis continued to phone Euler on a monthly basis to see

whether Euler was interested in buying silver futures. Euler testified that each time he told Regis that he was not interested in buying silver futures but that Regis should call when the market becomes "bullish".

18. Regis testified that the reason he contacted Euler was because he wanted to reactivate old Clayton brokerage accounts and he knew that Euler had experience in the commodities market as evidenced by National Coin's 1980 corporate account with Clayton and Euler's 1983 personal account with Clayton.

19. On or about April 3, 1987, Regis sent National Coin and Euler new account forms to complete and customer agreements to sign to authorize any transactions through Balfour.

20. Euler testified that on the morning of April 24, 1987, Regis called Euler and told him that "the precious metals market is very hot ... looks like old times ... many longs ... market is going up ... July silver contracts are as hot as a pistol ... you had better come to Balfour's branch office quickly."

21. Regis testified that between 1:45 and 2:00 p.m. on the afternoon of April 24, 1987, Euler came to Balfour's branch office.

22. Regis testified that when Euler arrived at Balfour's offices, Euler told Regis that the condition of the silver market reminded him of the long lines of the silver bull market of 1980–81 and that he (Euler) expected the price of silver to go up.

23. On the afternoon of April 24, 1987, Euler hurriedly signed a number of documents to authorize transactions on behalf of National Coin through Balfour. Among the documents which Euler signed was a Customer Application. The Customer Application, *inter alia*, stated:

I represent to BALFOUR MACLAINE, INC. that I recognize that futures trading involves a speculative activity in fast moving, highly leveraged markets where prices are subject to sharp fluctuations which may result in a severe loss of my capital. I agree to be responsible for making all final decisions as to transactions effected in my account and understand that each order I enter to buy or to sell must be complete as to Commodity. Quantity and Price, unless I have granted signed trading authority to another party to make these decisions for me. I am willing and able to assume the financial risks and other hazards of futures trading, and in consideration of your carrying this account, I agree that I will in no way hold BALFOUR, MACLAINE, INC. responsible for losses incurred through following its trading recommendations or suggestions.

24. On the afternoon of April 24, 1987, Euler, on behalf of National Coin, also signed a Commodity Customer's Agreement which provided, in part:

BMI [Balfour] will not be responsible for delays in the transmission of orders due to a breakdown or failure of transmission or communication facilities, or any other cause or causes beyond its reasonable control or anticipation.... Customer recognizes that trading in commodity interests involves speculative activity in fast moving, highly leveraged markets where prices are subject to sharp fluctuations which may result in a severe loss of capital. In consideration of BMI's carrying this account, Customer agrees that Customer will in no way hold BMI responsible for losses incurred through following its trading recommendations or suggestions since Customer must make all final trading decisions. [Paragraph 5].

25. Paragraph 15 of the Commodity Customer's Agreement signed by Euler on behalf of National Coin provides that Balfour was entitled to be reimbursed by National Coin for legal fees and expenses if it was required to file suit against National Coin.

26. On the afternoon of April 24, 1987, Euler, on behalf of National Coin, also signed a "Risk Disclosure Statement", the provisions of which were identical to those contained in the two previous Risk Disclosure Statements Euler had signed in 1980 and 1983. *See* Finding of Fact # 11.

27. Euler testified that he did not read any of these documents prior to signing them on the afternoon of April 24, 1987. He testified, however, that he understood the contents of each of the documents he signed that afternoon.

28. On the afternoon of Friday, April 24, 1987, Euler, on behalf of National Coin, deposited a check for $33,000 with Balfour to satisfy the initial margin requirements for trading in silver futures on its behalf. ($3300 × 10 silver futures contracts).

29. On the afternoon of Friday, April 24, 1987, Euler on behalf of National Coin, authorized Balfour to buy 100 July 1987 Comex silver futures contracts and 10 April 1987 Comex silver futures contracts.

30. Regis testified that because the "July silver was limit up" (more buyers than sellers) the purchase of the 10 July 1987 Comex silver futures contracts had to be done through a "switch transaction" whereby the 10 April 1987 silver futures contracts were immediately bought and sold.

31. Regis testified that he was aware that Euler had never previously been involved in a switch transaction and that he (Regis) explained the mechanics of such a transaction to Euler. Regis testified that after he explained the nature of the switch transaction to Euler, Euler understood and subsequently authorized the switch transaction described in Finding of Fact # 30.

32. Plaintiff's expert witness, John W. Stillwaggon, a vice president with the Tellefsen Consulting Group and who has had over 30 years experience in the futures industry, testified that Regis did "nothing out of the ordinary" in using a switch transaction to purchase the 10 July 1987 Comex silver futures contracts.

33. The purchase and sale of the 10 April 1987 Comex silver futures contracts created a loss in National Coin's account of $38,277.80.

34. Euler testified that he became aware of this loss on April 24, 1987.

35. Euler testified that he received a phone call from Regis on Monday, April 27, 1987 at approximately 9:30 a.m. Euler tes- tified that during the phone conversation, Regis told Euler that "we did the right thing [switch transaction]—market is bullish—there are lots of longs—the market is broad [real market is not speculative]."

36. Euler testified that he received another phone call from Regis that same morning at approximately 10:50 a.m. Euler testified that during this phone conversation, Regis told Euler that "we are still in great shape and the spot market is strong". Regis suggested that Balfour place a sell stop-loss at $9.69 per ounce to liquidate the 10 July 1987 silver futures contracts. A sell-stop order is an order to buy or sell a stated number of futures contracts at the market when the market reaches a specific price.

37. Regis never told Euler during this phone conversation that Euler could have sold the 10 July 1987 silver futures contracts at the market price which was $9.89 an ounce and by so doing could have recovered his initial deposit of $33,000.

38. Regis testified that the reason he never discussed with Euler the possibility of selling the 10 July 1987 silver futures contracts at 9.89 an ounce was because Euler told Regis that he (Euler) was looking to make a profit.

39. Euler testified that during this phone conversation, Regis never told him whether the price of the April, 1987 Comex silver contract ("spot price") was going up or down. Euler testified that had Regis, for example, told him that the spot price had declined from $11.25 per ounce at 9:07 a.m. on April 17, 1987 to $10.00 per ounce at 10:48 a.m. on April 27, 1987, "he would have got out." Although Euler could have found out this information by merely checking the screen in his office, he testified that at 10:48 a.m. he was too busy to check his screen.

40. Regis testified that to say the price of spot silver was declining from 9:07 a.m. on April 27, 1987 to 10:48 a.m. on that same morning is to generalize. Regis testified that in fact the price of spot silver was taking two steps down for every one step up and thus the price of spot silver was

increasing as well as decreasing during this interval. In fact, even at 10:50 a.m., Regis was aware of trades of spot silver selling at more than $10.60 per ounce.

41. During the 10:50 a.m. telephone conversation, Euler, on behalf of National Coin, authorized Regis to place a sell stop-loss order with Balfour at $9.69 per ounce to liquidate the 10 July 1987 silver futures contracts.

42. At 10:52:15 a.m., immediately after Regis finished speaking on the telephone with Euler, Regis' associate placed the sell stop-loss order to liquidate the 10 July 1987 silver futures contracts with Balfour's central order desk.

43. At 10:53:09 a.m., the clerk at Balfour's central order desk placed the sell stop-loss order with an independent floor broker, Great American Futures, Ltd. ("Great American"). For the purposes of this action, we define a floor broker in accordance with the Commodity Exchange Act as follows:

> The words "floor broker" shall mean *any person* who, in or surrounding any "pit," "ring," "post," or other place provided by a contract for the meeting of persons similarly engaged, shall purchase or sell for any other person any commodity for future delivery on or subject to the rules of any contract market.

7 U.S.C.S. § 2 (emphasis added).

44. Mr. Thomas, the executive vice-president of operations for Balfour testified that Balfour does not execute orders. Therefore, it has been Balfour's practice to use an independent floor broker such as Great American to execute its orders.

45. Thomas testified that Balfour had used Great American, a partnership, on several occasions to execute its orders because its "service has been good."

46. Stillwaggon testified that a futures commission merchant such as Balfour cannot execute an order. Rather, the only responsibility of the futures commission merchant is to transmit the order to the floor of the commodity exchange.

47. Regis never discussed with Euler how the sell stop-loss order would be executed. Regis never told Euler that the sell stop-loss order would be executed by Great American and not Balfour.

48. Regis testified that he never tells a customer the identity of the floor broker ultimately responsible for executing an order because he does not know the identity of such broker. Regis testified that his only responsibility is to phone in an order to Balfour's central order desk and that he assumes such order will be placed with a licensed floor broker who will execute the order.

49. Stillwaggon testified that there is "no reason" for a futures commission merchant such as Balfour to tell a customer the manner in which an order is executed or the name of the party responsible for executing the order.

50. In addition to filling customer orders, floor brokers are permitted to trade commodities for their own accounts.

51. National Coin was never advised that the partners in Great American were trading July 1987 silver futures contracts for their own accounts.

52. Euler testified that "it would have made a difference" had he known the identity of the floor brokers who were responsible for executing his order since these floor brokers were trading July 1987 silver futures contracts for their own accounts and thereby competing with National Coin.

53. Euler testified that on the two previous occasions when he traded silver futures through Clayton and on any other occasion when he traded commodities, he never asked to know the identity of the floor broker responsible for executing his order.

54. When the sell stop-loss order was received by Great American, it was time stamped 10:53 and filed by one of Great American's clerks in a book of orders to be executed when it was elected.

55. On the morning of April 27, 1987, Balfour placed a sell stop-order for its own account with Great American to sell 100 silver futures contracts at $9.60 per ounce. This sell stop-loss order was received by Great American and time stamped 9:39.

56. Great American maintains the orders in the book in price sequence. Thus, in a normal market day, if an order to sell at $9.69 became a market order before an order to sell at $9.60, the order to sell at $9.69 would be given first priority since $9.69 represents a higher price than $9.60.

57. A stop-loss order becomes a market order when a transaction in the futures contracts for futures options occur at or below the specified price after the order is received in a ring, or if so specified by the customer, when an offer for the futures contract or futures option is made at below the specified price. Rule 4.07(d)(1) of New York Commodity Exchange.

58. National Coin's stop-loss order became a market order at 12:30 p.m. on April 27, 1987, when a trade occurred at $9.650. At that time, National Coin's stop order to sell 10 silver contracts was a market order and the Balfour order to sell 10 silver contracts at $9.60 per ounce had not been elected. National's order to sell 10 silver contracts at $9.60 per ounce was elected first according to the Rules of the Commodity Exchange and according to the practice of Balfour.

59. Great American was able to execute Balfour's order to sell 100 silver contracts but was unable to execute National Coin's order to sell 10 silver contracts.

60. The reason Great American could not execute National Coin's stop-loss order was because the conditions of the silver market became fast and hectic at 12:28 p.m. on April 27, 1987 as evidenced by the fact that the price of July silver went from "limit up" (more buyers than sellers) to "limit down" (more sellers than buyers) in a matter of five to seven minutes. (*See* Plaintiff's Exhibit 16).

61. Due to the fast and hectic market conditions, Great American's floor brokers were unable to coordinate their selling efforts to insure that sell-stop orders were executed in the proper time sequence.

62. Great American did not have any procedure to insure that orders were being executed in the proper price sequence.

63. Stillwaggon testified that *under normal market conditions* if the same floor broker had both the sell stop-loss order for 10 July silver contracts at $9.69 per ounce and the sell stop-loss order for 100 July silver contracts at $9.60 per ounce, he would have breached his duty if he executed the order for 100 July silver contracts at $9.60 per ounce before he executed the order for 10 July silver contracts at $9.69 per ounce.

64. Stillwaggon testified that if one floor broker had the sell stop-loss order for 10 July silver contracts at $9.69 per ounce and another broker had the sell stop-loss order for 100 July silver contracts at $9.60 per ounce, there is no requirement for the two brokers to coordinate their activities to insure that the sell stop-loss order for 10 July silver contracts at $9.69 per ounce is executed before the sell stop-loss order for 100 July silver contracts at $9.60 per ounce.

65. It was not determined at trial whether the sell stop-loss order for 10 July silver contracts at $9.69 per ounce and the sell stop-loss order for 100 July silver contracts at $9.60 per ounce were in the hands of one floor broker or in the hands of two difference floor brokers.

66. Great American received an order to sell 4 July silver contracts at 12:32 p.m. on April 27, 1987.

67. Thomas Urynowicz, a partner with Great American, successfully executed the order to sell 4 July silver contracts despite the fact that this order was not received by him until after National Coin's order had become a market order.

68. The order to sell 4 July silver contracts was able to be executed because at the time it was elected, the market conditions were not fast and hectic as they had been when National Coin's order had been elected.

69. When an order is not executed, it is marked "unable" by one of Great American's clerks.

70. National Coin's sell stop-loss order was marked "unable."

71. Stillwaggon testified that when a broker marks an order "unable", he must

go to the floor governor and recite facts concerning whether he used due diligence in attempting to execute the order.

72. National Coin's sell stop-loss order was also marked "SPW." SPW stands for Steven Willner who is a member of the floor committee. The fact that the sell-stop order was marked SPW indicates that the floor committee found that Great American used due diligence in attempting to execute National Coin's sell-stop order and that the market situation ultimately prevented the order from being executed.

73. Mr. Thomas, the executive vice president of operations for Balfour testified that after Balfour places an order with a floor broker, Balfour does not know if such order is ultimately executed in the proper sequence.

74. Euler testified that he received a telephone call from Regis at 12:30 p.m. on April 27, 1987 during which Regis told Euler that National Coin's stop-loss order had been executed.

75. Euler testified that he became concerned at 5:00 p.m. on April 27, 1987 when he heard no response from Balfour concerning his transaction. He testified that he was looking to Balfour to execute his stop-loss order.

76. Euler testified that by 7:00 p.m. on April 27, 1987, he thought "he had been taken" since no one knew what had happened to his order.

77. On the afternoon of April 28, 1987, Regis called Euler and informed him that his order had not been executed due to fast market conditions and that Regis received a margin call because of the drop in the price of silver. Euler informed Regis that he was not going to honor the margin call and that as far as he was concerned, he no longer had any responsibility for the trade.

78. On April 29, 1987, the 10 July 1987 contracts were liquidated at a price of $7.93 per ounce, for a loss of $61,557.80.

79. As a result of the trades made on behalf of National Coin, National Coin sustained losses in its account, after applicable credits, of $66,558.20.

80. In 1987, Euler and National Coin traded silver futures through Balfour and, as had happened when they traded through Clayton in 1980 and 1983, they lost money in doing so.

The court makes the following Conclusions of Law:

1. Jurisdiction is founded upon 28 U.S. C. § 1332, based upon the diverse citizenship of the parties, and the amount in controversy, which exceeds $10,000, exclusive of interest and costs.

2. Venue in this district is proper based upon 28 U.S.C. § 1391(a), in that National Coin resides here and the claim arose here.

3. Euler is an experienced investor in the silver futures market who appreciates the risk of loss involved in trading in silver futures and who in the past has lost money by trading in silver futures. As a result of his experience, Euler was fully familiar with margin calls and the possibility of enormous losses.

4. Euler was authorized to act on behalf of National Coin in connection with its transactions with Balfour.

5. Balfour was properly authorized by National Coin to buy 10 July 1987 Comex silver futures contracts and 10 April 1987 Comex silver futures contracts on April 24, 1987.

6. Balfour was properly authorized by National Coin to sell the 10 April 1987 Comex silver futures contracts on April 24, 1987.

7. National Coin is liable to Balfour for $38,277.80 for the purchase and sale of the 10 April 1987 Comex silver futures contracts on April 24, 1987.

8. On April 27, 1987, Balfour was properly authorized by National Coin to place a sell stop-loss order at $9.69 per ounce to liquidate the 10 July 1987 silver futures contracts.

9. On April 27, 1987, Balfour properly placed the sell stop-loss order with an independent floor broker, Great American.

10. A futures commission merchant is an agent of the client and, accordingly, owes the client a fiduciary duty. *Sherman*

*v. Sokoloff,* 570 F.Supp. 1266, 1269 n. 10 (S.D.N.Y.1983); *see e.g., Monette v. Premex, Inc.,* (CFTC 1983) 2 Comm.Fut.L.Rep. (CCH) ¶ 21,733 at 26,882 (citing cases); *Graves v. Shearson, Hayden Stone,* (CFTC 1981) [1980–1982 Trans. Binder] Comm.Fut. L.Rep. (CCH) ¶ 21,301 at 25,521.

11. A futures commission merchant owes his client a fiduciary duty in taking orders, securing trades and in dealing with customer funds. *See Sherman v. Sokoloff, supra;* 17 C.F.R. § 1.3(p) (1987); 17 C.F.R. §§ 1.20–1.28 (1987) (obligations regarding customer funds).

12. In *Sherman v. Sokoloff, supra,* the plaintiffs had entered into a partnership with Sokoloff under which Sokoloff had invested the plaintiffs' money in platinum futures. Sokoloff had opened a platinum account with the defendant Rosenburg Commodities, a futures commission merchant. Sokoloff then had breached his agreement with the plaintiffs and quickly lost a large sum of money. Plaintiffs sought to hold Rosenburg liable for their losses on the ground that Rosenburg must have known of Sokoloff's fraudulent trading but failed to alert them to it. Rosenburg moved for summary judgment on the claims against it, and the trial court granted the motion, stating:

> Our own research has located no cases where a broker (or FCM) in Rosenburg's position has been saddled with the obligation of monitoring and reporting the trading pattern of a person *in no way affiliated to him,* let alone a partner of plaintiffs. We decline the invitation to impose such a duty. *Id.* at 1270 (emphasis added).

13. Great American, as an independent broker, was in no way affiliated to Balfour as an agent, employer, director or officer of Balfour. In fact, the provision in the Commodity Customer's Agreement entitled CONSENT TO TAKE THE OTHER SIDE OF AN ORDER states "Customer hereby agrees that ... when Customer executes, sells or buys orders on Customer's behalf, BMI [Balfour], its directors, officers, employees, *agents, and any floor broker* may buy or sell...." (emphasis added). This language demonstrates that a floor broker is considered a separate entity from one of *Balfour's* directors, officers, employees or agents.

14. Accordingly, Balfour did not owe National Coin a fiduciary duty to monitor and supervise Great American's trading activities including the execution of National Coin's sell stop-loss order.

15. Even if Great American was affiliated with Balfour in some manner, the evidence adduced at trial reveals that Great American did not execute out of time and price sequence on April 27, 1987. Rather, the *only* reason that Great American was unable to execute National Coin's sell stop-loss order on April 27, 1987 was due to fast and hectic market conditions.

16. Paragraph 3 of the Risk Disclosure Statement which Euler signed on April 24, 1987 specifically warned that "[p]lacing contingent orders such as a "stop-loss" order "will not necessarily limit your losses to the intended amounts, *since market conditions may make it impossible to execute such orders.*" (emphasis added).

17. Although Euler testified he did not read the Risk Disclosure Statement or any of the other documents he hurriedly signed on April 24, 1987, "[i]gnorance of the contents of a document or failure to read before signing is no defense to a contractual obligation under Pennsylvania law." *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 900 (3d Cir.1981), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). "The general rule is that absent an allegation of fraud or incompetence a person has a duty to read a contract before signing it and his failure to do so will not excuse his ignorance of its contents." *Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F.Supp. 807, 811 (E.D.Pa. 1981), *aff'd,* 676 F.2d 688 (3d Cir.1982). A claim that a contract was signed in haste is not a justification for ignorance of its contents.

18. In any event, Euler testified that he read the Customer Risk Disclosure Statement when he opened a corporate commodity account with Clayton in 1980 and again

when he opened the personal commodity account with Clayton in 1983 and both times he was aware of Paragraph 3 and appreciated the risk involved. Euler also testified that he "understood" the contents of the Risk Disclosure Statement he signed on April 24, 1987.

19. Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, like analogous provisions of federal securities laws imposes liability on brokers (or FCM's) for omissions of material fact and the making of material misrepresentations. *Herman v. T. & S. Commodities, Inc.*, 592 F.Supp. 1406, 1416 (S.D.N.Y.1984).

20. A material fact is one which "a reasonable man would attach importance [to] in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied sub nom. List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

21. The test is subjective and thus an investor's experience must be considered to determine whether Section 4b has been violated. *See, e.g., Dachslager v. Rosenthal and Co.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,890 (CFTC ALJ Sept. 7, 1979); *Wagoner v. Rosenthal and Co.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,623 (CFTC ALJ June 12, 1978).

■ 22. Regis' failure to tell Euler that the spot price of silver had declined from $11.25 per ounce at 9:07 a.m. on April 27, 1987 to $10.00 per ounce at 10:48 a.m. on April 27, 1987 did not constitute an omission of a material fact on the part of Balfour. In the first instance, although the spot price of silver at 9:07 a.m. on April 27, 1987 was $11.25 per ounce and the spot price of silver at 10:48 a.m. on April 27, 1987 was $10.00 per ounce, Regis testified that to say the spot price of silver was actually declining during this interval is to generalize. Regis testified that in fact the price of spot silver was taking two steps down for every one step up and thus the price of spot silver was increasing as well as decreasing during this interval. In fact, even as late as 10:50 a.m., Regis was aware of trades of spot silver selling at more than

$10.60 per ounce. Moreover, after examining the condition of the silver market from 9:07 a.m. to 10:48 a.m. on April 27, 1987, Stillwaggon testified that Regis "had every reason to believe that the price of silver would move higher given what transpired."

In the second instance, Regis was aware that Euler had considerable experience in the silver futures market. In fact, Regis testified that the reason he contacted Euler after Regis joined Balfour was because he knew that Euler had experience in the commodities market as evidenced by National Coin's corporate account with Clayton and Euler's 1983 personal account with Clayton. In addition, Euler had a screen in his office through which he kept in daily contact with the silver market and changes in the spot price of silver at any given time. After all, when Euler arrived at Balfour's branch office on April 24, he already knew that the condition of the silver market reminded him of the long lines of the silver market of 1980–81. Given Euler's experience, we find that Regis, on behalf of Balfour had no duty to keep Euler apprised of *every* fact concerning the spot price of silver. If such were the case, an experienced investor such as Euler could recover damages from his broker (FCM) merely by proving non-transmission of *some* fact which, he could testify with the *wisdom of hindsight*, would have affected his judgment had he learned of it.

23. For the reasons stated in Conclusion of Law # 22, Regis' statement to Euler during the 10:50 a.m. telephone conversation on April 27, 1987 that the spot market for silver is "strong" did not constitute a material misrepresentation.

As noted above, at 10:50 a.m., Regis was aware of trades of spot silver selling at more than $10.60 per ounce. In addition, Stillwaggon testified that Regis "had every reason to believe that the price of silver would move higher given what transpired."

24. On April 29, 1987, Balfour acted properly in liquidating the 10 July 1987 silver futures contracts on behalf of National Coin.

25. National Coin is liable to Balfour for $61,557.80 for the sale of the 10 July 1987 silver futures contracts on April 29, 1987.

26. National Coin breached the Commodity Customer's Agreement by failing to pay for the losses sustained in connection with the trades performed by Balfour on its behalf.

27. National Coin is liable to Balfour for $66,558.20 for the losses sustained in National Coin's account.

28. National Coin is also liable to Balfour for the costs of suit, including a reasonable attorney's fee.

29. Judgment is hereby entered in favor of Balfour and against National Coin for $66,558.20, plus interest at 6 percent from April 29, 1987 through March 4, 1988, for $3,050.56, for a total judgment of $69,608.76.

30. Balfour shall, within thirty days, file with the court an application for reimbursement of its expenses incurred in connection with this claim, including its attorney fees.