Hillsborough-northern judicial district
No. 97-553

MERRILL LYNCH FUTURES, INC.

v.

DAVID S. SANDS

April 21, 1999

*Sherin & Lodgen LLP*, of Boston, Massachusetts (*John C. La Liberte & a.* on the brief, and *Bryan G. Killian* orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Thomas Quarles, Jr. & a.* on the brief, and *Mr. Quarles* orally), for the defendant.

HORTON, J. The defendant, David S. Sands, appeals the decisions of the Superior Court (*Lynn*, J.) denying his motion for correction, modification, or vacatur of a securities arbitration award and his motions for discovery sanctions. We affirm.

From 1981 to March 1993, the defendant maintained a commodity futures account with the plaintiff, Merrill Lynch Futures, Inc. (Merrill Lynch). On January 18, 1993, the defendant discussed with a Merrill Lynch broker the possibility of "shorting" lumber futures. *See United States v. Dial*, 757 F.2d 163, 164-66 (7th Cir.), *cert. denied*, 474 U.S. 838 (1985) (general discussion of commodity futures investing). The defendant subsequently established a short position in lumber futures. After incurring losses, the defendant asked the broker if Merrill Lynch had conducted research on the lumber market. The broker responded that Merrill Lynch did not have a lumber analyst. In fact, a senior strategist with the firm had issued commentary warning against "shorting" lumber. The broker knew of the strategist's comments but did not disclose them to the defendant. Nevertheless, the defendant had access to other information that was negative toward his investment strategy.

The defendant continued trading in the lumber market, despite suffering losses. Merrill Lynch issued margin calls on the defen-

dant's account. In late February or early March 1993, the defendant informed his broker that he could not satisfy further margin calls. Merrill Lynch did not liquidate the defendant's account at that time, and additional losses were incurred. On March 5, Merrill Lynch issued a margin call on the defendant's account. The defendant informed his broker that day that he could not meet the call, but did not order liquidation of his lumber positions until March 8, 1993. On March 9, Merrill Lynch management learned that the defendant could not meet additional margin calls. Merrill Lynch began liquidating the account, completing the task on March 11. The defendant's liquidated account displayed a debit balance of more than $500,000.

The defendant denied liability, and Merrill Lynch brought suit against him in superior court to collect the debit balance. The court stayed the case after the parties agreed to arbitration before the National Futures Association. At arbitration, the defendant advanced counterclaims of, *inter alia,* fraud and negligence. Following an arbitration hearing, the arbitrators rejected the defendant's claims and awarded Merrill Lynch a total of $612,812 for the unpaid debit balance plus interest. Merrill Lynch moved to confirm the award in the superior court; the defendant objected and moved for correction, modification, or vacatur of the award. The defendant also moved for sanctions against Merrill Lynch. The superior court denied the motions and confirmed the arbitration award. This appeal followed.

 An arbitration decision may be corrected or modified upon a showing that the arbitrators committed "plain mistake." RSA 542:8 (1997). A "plain mistake" is an error that "is apparent on the face of the record and which would have been corrected had it been called to the arbitrators' attention." *Rand v. Aetna Life & Casualty Co.*, 132 N.H. 768, 771, 571 A.2d 282, 284 (1990). It must be shown that the arbitrators manifestly fell into such error concerning the facts or law, and that the error prevented their free and fair exercise of judgment on the subject. *Id.* When undertaking a "plain mistake" analysis, we afford great deference to the arbitrators' decision. *Masse v. Commercial Union Ins. Co.*, 134 N.H. 523, 526, 593 A.2d 1164, 1166 (1991). We examine the face of the record to determine if there is validity to the claim of "plain mistake," and defer to the arbitrators' decision if the record reveals evidence supporting it. *See id.; Masse v. Commercial Union Ins. Co.*, 136 N.H. 628, 632, 620 A.2d 1041, 1044 (1993) (decision may be against weight of evidence). We bear in mind that the arbitrators, as the triers of fact, were not

obligated to accept any witness's testimony as true, even if the testimony was uncontradicted. *Masse*, 136 N.H. at 632, 620 A.2d at 1045.

■ The defendant contends that the arbitrators were plainly mistaken in not finding that Merrill Lynch committed commodities fraud under the Commodities Exchange Act, 7 U.S.C. § 6(b) (1980 & Supp. 1998), when its broker intentionally withheld lumber market research and commentary. We find, however, that the arbitrators did not commit "plain mistake" in rejecting the defendant's claim of commodities fraud. To establish commodities fraud, the defendant was required to prove that the omission was (1) one of material fact, (2) made with *scienter*, (3) on which he reasonably relied, and (4) which proximately caused him injury. *See Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir. 1986) (courts traditionally look to the securities laws to interpret similar provisions of the Commodities Exchange Act); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991) (setting forth elements of securities fraud).

Omitted information is material if there is a substantial likelihood that, under all the circumstances, it would have assumed actual significance in the deliberations of the reasonable investor. *Hlavinka v. Commodity Futures Trading Com'n*, 867 F.2d 1029, 1034 (7th Cir. 1989). The test has a subjective component in that the investor's experience and the nature of the investments in question must be considered. *See Balfour Maclaine v. National Exchange, Inc.*, 697 F. Supp. 835, 844 (E.D. Pa. 1988).

Merrill Lynch adduced evidence at arbitration showing that the information the broker withheld lacked materiality. The record indicates that the defendant was an experienced investor who had previously established risky positions in various commodities, including lumber futures. Further, there is evidence that during the transactions at issue the defendant was privy to considerable information concerning the lumber market. Merrill Lynch sent the defendant weekly commodities reports containing information that was negative toward "shorting" lumber futures. Also, readily available commentary and information in the media cast doubt on the soundness of his strategy. In addition, the defendant frequently discussed the lumber market with his Merrill Lynch broker, who testified he related to the defendant all pertinent information gathered by the Merrill Lynch research department. The broker further testified that he withheld only the subjective commentary of the senior strategist because he did not know whether the strategist

was sufficiently experienced in the lumber market to be deemed reliable. As evidence of yet another source of information, a broker with a different investment firm testified that he provided the defendant with information he obtained from his office regarding the lumber market. The defendant testified that he was aware of the lumber market's volatility, as well as objective factors potentially responsible for the upward movement of lumber prices. Despite his knowledge, he continued to invest in lumber futures.

In light of this evidence, the arbitrators could have found that the commentary withheld by the defendant's broker was consistent with information the defendant already knew but had chosen to disregard. *See Balfour Maclaine*, 697 F. Supp. at 844. The arbitrators, therefore, could have concluded that even if the Merrill Lynch strategist's commentary had been disclosed, it would not have been substantially likely to have been a significant deliberative factor to a reasonable investor with the defendant's knowledge, experience, and proclivity for risk-taking. The claim of commodities fraud could have failed at arbitration on this basis alone. We do not reach the defendant's claim of common law fraud because it was not argued before the superior court and is therefore not preserved for appellate review. *Holyoke Mutual Ins. Co. v. Carr*, 130 N.H. 698, 699, 546 A.2d 1070, 1071 (1988).

The defendant next argues that the arbitrators committed "plain mistake" in not finding Merrill Lynch negligent for failure to properly liquidate his account. We disagree.

The defendant contends that Merrill Lynch's customer agreement and various provisions of Merrill Lynch's internal policy manuals established a duty to liquidate his account as soon as he indicated that he could not meet further margin calls. Had Merrill Lynch liquidated according to its own rules, argues the defendant, some of his losses would have been averted. The customer agreement and the cited internal policy manual provisions reveal that Merrill Lynch was not obligated to liquidate the defendant's account for his protection because Merrill Lynch's right to liquidate is solely for its own protection. First, the customer agreement states that "Merrill Lynch shall have the right . . . whenever in our discretion we consider it necessary for our protection . . . to: (A) sell, exercise, offset or otherwise liquidate any or all . . . commodity futures contracts." Second, the policy manual states that "[a]s soon as a customer indicates that he is unable or unwilling to pay promptly for a purchase, to meet a call or to deliver securities, even if this occurs prior to settlement date, the office must *liquidate or cover*." It

further advises that "'[p]laying the market' under these conditions generally leads to a greater loss, so [resident managers] must make certain that liquidations are not delayed." This internal liquidation rule, however, is contained within a manual section entitled "Control of Unsecured Debit Balances," the introductory language to which states that "[i]t is the responsibility of the [resident manager] to protect Merrill Lynch from losses." The defendant cannot establish negligence liability based on Merrill Lynch's failure to follow in-house rules or policies that were not designed to protect him. *See J.E. Hoetger & Co. v. Ascencio*, 572 F. Supp. 814, 821-23 (E.D. Mich. 1983).

The defendant's account was non-discretionary; that is, Merrill Lynch did not have the authority to make investment decisions in the defendant's interest. The defendant waited until March 8, 1993, to instruct Merrill Lynch to liquidate his account. In this way, the defendant was able to maintain his lumber positions for a short time after he informed Merrill Lynch that he could meet no further margin calls. The defendant was permitted to continue "playing the market" despite his professed inability to meet margin calls, which are simply a protective measure for the brokerage firm. The defendant, having suffered further losses, cannot now be heard to complain that he should not have been allowed to stay in the market. Merrill Lynch was not obligated to liquidate the account to protect the defendant from further imprudent investment activity. *See id.* at 821 (rejecting "paternalistic" argument that broker "should have protected [investor] from his own greed").

■ The defendant also argues that Merrill Lynch violated its common law duty to mitigate damages by failing to liquidate sooner. Relying on *Agra, Dill & Duffus, Inc. v. Benson*, 920 F.2d 1173 (4th Cir. 1990), the defendant contends that Merrill Lynch was required to mitigate its damages through liquidation as soon as he informed the firm that he could not meet additional calls. *Benson*, however, does not support the premise that brokers must immediately liquidate when investors announce that further margin calls cannot or will not be met. *Benson* establishes that when an investor is in a losing position, cannot meet margin calls, and clearly articulates a desire to liquidate, the broker must do so in a commercially reasonable fashion to mitigate contract damages. *See id. Benson* provides no authority for imposing a duty to liquidate in a case such as this. Here, Merrill Lynch completed the liquidation of the defendant's account within three days of receiving his instruction to liquidate.

The defendant next argues that Merrill Lynch wrongfully withheld material documents detailing applicable internal policies and practices, causing the arbitrators to commit "plain mistake" through its "misconduct." Specifically, the defendant contends that if Merrill Lynch had disclosed its Commodity Compliance Outline and Commodity Credit Manuals, the arbitrators would have understood the standards of care and duties owed by a commodity futures broker. The defendant asserts that these documents contain provisions that required Merrill Lynch to provide him with the commentary that was withheld by his broker and to liquidate his account when he indicated he could not meet additional margin calls.

■ There is no evidence in the record that Merrill Lynch intentionally withheld the Commodity Compliance Outline and Commodity Credit Manuals. Furthermore, as we have already discussed, there is abundant evidence demonstrating that the Merrill Lynch strategist's commentary pertaining to lumber was not material information. Any in-house rule that might have been interpreted to have required disclosure of the commentary, therefore, would not have altered the arbitration decision spurning the claim of commodities fraud. With regard to the defendant's negligent liquidation claim, the outline and manual provisions cited by the defendant do not require liquidation for his benefit. Again, violation of in-house rules protecting the brokerage firm cannot create a cause of action on behalf of an investor. Even if the outline and manuals had been disclosed, the defendant would not have prevailed at arbitration on his negligent liquidation claim.

We affirm the superior court's decision denying the defendant's motion for correction, modification, or vacatur of the arbitration award. The record does not support the defendant's claims of "plain mistake" and "misconduct."

■ We also affirm the court's denial of the defendant's motions for discovery sanctions, filed in relation to Merrill Lynch's alleged refusal to disclose the Commodity Compliance Outline and Commodity Credit Manuals. The decision whether to impose discovery sanctions is a matter resting in the sound discretion of the trial court. *See Daigle v. City of Portsmouth,* 131 N.H. 319, 325, 553 A.2d 291, 295 (1988). We will not disturb the trial court's ruling on discovery sanctions absent an abuse of discretion. *See id.* at 326, 553 A.2d at 295.

For reasons we have already identified, the superior court aptly described the relevancy of the outline and manuals as being "tenuous at best." Moreover, after reviewing affidavits of Merrill

Lynch's counsel explaining her discovery efforts, the court determined in its discretion that Merrill Lynch had fully complied with its discovery order. In a renewed motion for sanctions, the defendant asserted that Merrill Lynch's counsel made misrepresentations to the court regarding discovery matters. Merrill Lynch responded that the defendant had taken its attorney's statements out of context in an effort to delay a determination on the merits. The court denied the defendant's motion without elaboration, apparently finding his arguments unpersuasive.

█ Resolution of discovery issues is, for obvious reasons, a task best undertaken by the trial judge. In responding to the requests for sanctions, the court was called upon to assess credibility and to interpret the meaning of statements made at a hearing. We cannot say that the trial court abused its discretion in resolving these issues in favor of Merrill Lynch and denying the requests for sanctions.

We have examined the defendant's remaining arguments and consider them to be without merit and warranting no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

*Affirmed.*

All concurred.