NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2015-0332

ALICE FINN

v.

BALLENTINE PARTNERS, LLC <u>&</u> <u>a</u>.

Argued:  January 27, 2016
Opinion Issued:  June 14, 2016

<u>Hage Hodes, P.A.</u>, of Manchester (<u>Jamie N. Hage</u> on the brief), and <u>Cohan Rasnick Myerson Plaut LLP</u>, of Boston, Massachusetts (<u>Robert D. Cohan</u> on the brief and orally), for the plaintiff.

<u>McLane Middleton, Professional Association</u>, of Manchester (<u>Wilbur A. Glahn, III</u>, <u>Michael A. Delaney</u>, and <u>Nicholas F. Casolaro</u> on the brief, and <u>Mr. Glahn</u> orally), for the defendants.

LYNN, J.  The plaintiff, Alice Finn, appeals an order of the Superior Court (<u>McNamara</u>, J.) denying her motion to affirm and granting the motion of the defendants, Ballentine Partners, LLC (BPLLC), Ballentine & Company, Inc., Roy C. Ballentine, Kyle Schaffer, Claudia Shilo, Andrew McMorrow, and Gregory Peterson, to vacate a final arbitration award in part pursuant to RSA 542:8 (2007).  Because we conclude that the trial court did not err in ruling that RSA 542:8 is not preempted by the Federal Arbitration Act (FAA), <u>see</u> 9 U.S.C. §§ 2,

9-11 (2012), and in ruling, pursuant to RSA 542:8, that the arbitration panel committed a plain mistake of law by concluding that res judicata did not bar Finn's claim, we affirm.

I

The record supports the following facts. Ballentine and Finn founded Ballentine Finn & Company, Inc. (BFI), a New Hampshire subchapter S corporation, in 1997. Each owned one half of the company's stock, and Finn served as the Chief Executive Officer. Later, four other individuals became shareholders of BFI. In 2008, Ballentine and the other shareholders forced Finn out of the corporation and terminated her employment. BFI asserted that the termination was for cause, and exercised its right to purchase Finn's shares at the price assigned to "for cause" terminations pursuant to the Shareholder Agreement (Agreement). At the time of her termination, Finn held 37.5% of the shares of BFI. BFI gave Finn a promissory note in the amount of $4,635,684, which represented 1.4 times earnings for her shares for the 12 months before her termination. This amount was below the fair market value of Finn's shares.

Pursuant to the Agreement, Finn challenged her termination before an arbitration panel in 2009.[1] This first arbitration panel found that Finn's termination was unlawful and awarded her $5,721,756 for the stock that BFI forced her to sell and $720,000 in lost wages. The panel recognized that BFI likely did not have sufficient liquidity to pay the award immediately, so it authorized BFI to make periodic payments through December 31, 2012.

After the first panel award, BFI formed BPLLC, contributed all of its assets and some of its liabilities to BPLLC, and became its sole member. BFI then changed its name to Ballentine & Company (Ballentine & Co.). After the reorganization, Ballentine & Co. sold 4,000 preferred units, a 40% membership interest in BPLLC, to Perspecta Investments, LLC (Perspecta). Perspecta paid $7,000,000 to Ballentine & Co. and made a $280,000 capital contribution to BPLLC. The defendants asserted that the membership interest had to be sold in order to raise funds to pay the arbitration award to Finn.

In 2013, Finn filed a complaint and a motion to compel arbitration in superior court, alleging that she was entitled to relief under the "Claw Back" provision of the Agreement. That provision provides, in essence, that if a founding shareholder of BFI sells shares back to the corporation and those shares are resold at a higher price within eight years, the founder is entitled to recover a portion of the additional price paid for the shares. The defendants moved to dismiss Finn's complaint, arguing that it was barred by res judicata.

_____

[1] The dispute resolution section of the Agreement requires the parties to proceed through negotiation, mediation, and/or arbitration before instituting a proceeding in court.

2

The trial court did not rule on the motion to dismiss; instead, it stayed the court proceedings and granted Finn's motion to compel arbitration, concluding that the issue of res judicata must be decided by arbitration in the first instance.

A second arbitration panel held a five-day hearing to decide Finn's new claims, which included breach of contract and unjust enrichment. It ruled that "[t]he findings of the first panel essentially resolve[d] Finn's contract claim for 'Claw Back' benefits because the predicate facts needed to support a contractual 'Claw Back' claim were found against Finn by that panel."[2] The second panel concluded, however, that Finn was entitled to an award based upon her unjust enrichment claim. Although it agreed with the defendants' argument that a party cannot be awarded relief under a theory of unjust enrichment when "there is an available contract remedy identified," the panel stated that this "legal principle cannot equitably pertain where the breaching party has, because of its wrongdoing, effectively eliminated the opposing party's contractual remedy, as happened here."[3] Therefore, the panel concluded that the defendants had been unjustly enriched by the sale of shares to Perspecta. Using the "Claw Back" provision in the Agreement as a guide only, the second panel awarded Finn $600,000 in equitable relief.

Returning to court, Finn moved to affirm, and the defendants moved to vacate in part, the second arbitration award. Applying the plain mistake standard of review found in RSA 542:8, the trial court ruled that the second panel's award of additional damages to Finn on her unjust enrichment claim

---

[2] The second panel reasoned that Finn would only be entitled to "Claw Back" benefits if the sale to Perspecta met three conditions: (1) BFI or its shareholders must have purchased her shares pursuant to the Agreement; (2) the purchase price for the shares must have been calculated under Section 7 of the Agreement; and (3) an "Acquirer" must have purchased the shares of the corporation within eight years of the original sale. The second panel recognized that the first panel found "that Finn was involuntarily terminated without cause and that BFI and its Shareholders could not, therefore, have purchased her shares pursuant to [the] Agreement because involuntary termination without cause was not one of the enumerated Events of Termination triggering the option." (Quotations omitted.) Because the second panel was bound by the first panel's finding, it concluded that BFI did not purchase Finn's shares pursuant to the Agreement. Therefore, the second panel concluded that Finn did not have a valid contract claim.

[3] The second panel reasoned:

> The first panel found that Respondents' conduct made it impossible for them to acquire Finn's stock "pursuant to" the . . . Agreement and at a price calculated under Section 7 (and that it was equally impossible to return Finn's stock to her and put her back in her former position at BFI). As a direct result, because "Claw Back" rights are only contractually viable if the referenced conditions are met, Finn was unilaterally deprived of her contractual "Claw Back" rights by the Respondents' wrongdoing. That circumstance did not arise because of some choice Finn could have made in 2008 but didn't. It arose because of Respondents' conduct terminating her without cause in violation of the parties' Shareholder Agreement. It would be unconscionable to permit the Respondents to profit from their wrongdoing.

3

was barred, under settled principles of res judicata, by the award of damages she received from the first panel.

Finn moved for reconsideration, arguing that the FAA applied to this case because the Agreement affected interstate commerce. Therefore, she argued, the trial court should have applied the more deferential FAA standard in reviewing the arbitration award because the FAA preempts state law. The trial court denied the motion, and this appeal followed.

II

On appeal, Finn asserts that the trial court erred in applying RSA 542:8 to review the second arbitration panel's award because state law is preempted by the FAA. Alternatively, she argues that, even if RSA 542:8 applies, the trial court erred because it did not afford sufficient deference to the panel's findings of fact and rulings of law. Finally, she argues that the trial court misapplied the doctrine of res judicata to her unjust enrichment claim. We examine her arguments in turn.[4]

A

Finn argues that the trial court erred in reviewing the second panel's award under RSA 542:8 instead of §§ 9 and 10 of the FAA. Relying primarily upon the decision of the United States Supreme Court in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008), she asserts that RSA 542:8 is impliedly preempted by the FAA because the Agreement is a contract affecting interstate commerce,[5] to which the FAA applies, and that failing to employ the more deferential federal standard of judicial review of arbitration awards "foils the objective Congress seeks to advance with the FAA." "Because the trial court's determination of federal preemption is a matter of law, our review is de novo." N.H. Attorney Gen. v. Bass Victory Comm., 166 N.H. 796, 801 (2014).

The federal preemption doctrine effectuates the Supremacy Clause of the United States Constitution. State v. Exxon Mobil Corp., 168 N.H. 211, 229

---

[4] Relying upon the language of section 23.2.4 of the Agreement, which states in relevant part that "judgment upon any [arbitration] award may be entered in any court having jurisdiction," Finn also claims that the second panel's award was not subject to review by the trial court at all because "the parties agreed to enter the award in court, they did not agree that the award could be challenged in court." We decline to address this argument because we agree with the defendants that it is not preserved for our review inasmuch as Finn never presented it to the trial court. See Thorndike v. Thorndike, 154 N.H. 443, 447 (2006) ("It is a long-standing rule that parties may not have judicial review of matters not raised in the forum of trial." (quotation omitted)).

[5] The defendants do not dispute Finn's contention that the Agreement is a contract that affects interstate commerce within the meaning of the FAA.

4

(2015). It ensures that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding," U.S. CONST. art. VI, by invalidating state laws that conflict with federal legislation. Exxon Mobil Corp., 168 N.H. at 229. Congress may expressly preempt a state law, or it may implicitly preempt a state law through "field" preemption or "conflict" preemption. See id.

The Supreme Court has held that "[t]he FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." Volt Info. Sciences v. Leland Stanford Jr. U., 489 U.S. 468, 477 (1989). Therefore, Finn presses conflict preemption, which "arises when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Exxon Mobil Corp., 168 N.H. at 229 (quotation omitted).

The trial court reviewed the second panel's award pursuant to RSA 542:8, which creates a procedure for parties to seek confirmation, modification, or vacatur of an arbitral award:

> At any time within one year after the award is made any party to the arbitration may apply to the superior court for an order confirming the award, correcting or modifying the award for plain mistake, or vacating the award for fraud, corruption, or misconduct by the parties or by the arbitrators, or on the ground that the arbitrators have exceeded their powers. Where an award is vacated and the time within which the agreement required the award to be made has not expired, the court may in its discretion, direct a rehearing by the arbitrators or by new arbitrators appointed by the court.

We have construed this statute to grant a court the authority to vacate an award for plain mistake if it "determine[s] that an arbitrator misapplied the law to the facts." Sherman v. Graciano, 152 N.H. 119, 120 (2005). Similarly, the FAA creates "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." Hall Street, 552 U.S. at 582.

Section 2 of the FAA provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such

5

a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Thus, the FAA applies to state courts insofar as § 2 prohibits state courts from refusing to enforce agreements to arbitrate.  Southland Corp. v. Keating, 465 U.S. 1, 14-16 (1984).

Finn's argument relies upon §§ 9,[6] 10[7] and 11[8] of the FAA.  In Hall

---

[6] Section 9 of the FAA provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.  If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.  Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding.  If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court.  If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

9 U.S.C. § 9.

[7] Section 10 of the FAA establishes the grounds for vacating an arbitral award.  It provides:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
> (b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.
> (c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

9 U.S.C. § 10.

Street, the Supreme Court held that the listed grounds for vacation, correction or modification of an arbitral award by a federal court, as set forth in §§ 10 and 11 of the FAA, may not be supplemented by the terms of the arbitration agreement entered into by the parties. Hall Street, 552 U.S. at 590. These provisions provide much more limited grounds for review of an arbitration award than does "plain mistake" review under RSA 542:8.

We do not agree with Finn's first argument that the FAA is the exclusive method by which to review the second panel's award because we conclude that §§ 9-11 of the FAA apply only to arbitration review proceedings commenced in federal courts. As we have already noted, the FAA creates some substantive rules that apply to arbitration agreements in both federal and state courts when the contract to arbitrate affects commerce. Southland Corp., 465 U.S. at 14-16. Section 2 of the act applies in state courts to prevent anti-arbitration laws from invalidating otherwise lawful arbitration agreements. Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 281 (1995). However, it does not follow that the FAA applies to state courts in its entirety. In fact, the Supreme Court has suggested that some of the statute's provisions apply only in federal courts. See Volt, 489 U.S. at 477 n.6. In considering whether other sections of the FAA apply in state courts, the Court noted that it has "never held that §§ 3 and 4, which by their terms appear to apply only to proceedings in federal court, . . . are nonetheless applicable in state court." Id. This comment clearly contemplates that the Court considers the application to the states of each section individually, rather than the application of the Act as a whole. Therefore, we consider whether §§ 9-11 of the FAA also use language that limits their application to federal courts.

The sections at issue in Volt made reference to either "the courts of the United States" or "any United States district court." Id.; see Southland Corp., 465 U.S. at 29 n.18 (O'Connor, J., dissenting) (explaining that "courts of the United States" is a term of art designating federal, not state courts). Likewise,

---

[8] Section 11 of the FAA establishes the grounds for modifying or correcting an arbitral award. It provides:

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

§§ 10 and 11, the sections that establish the limited grounds upon which arbitration awards may be upset, reference only the federal courts. 9 U.S.C. §§ 10, 11. Although § 9 of the FAA could be read to encompass state courts as well as federal courts, and to contemplate that state courts reviewing covered arbitration awards (i.e., those involving contracts affecting interstate commerce) must utilize exclusively the standards set forth in §§ 10 and 11, the Court has not interpreted the FAA in this fashion. In Hall Street, the Court not only acknowledged the potential for review of arbitration awards under state law, see Hall Street, 552 U.S. at 590, but even noted the possibility of a federal court reviewing an arbitration award under its "case management authority independent of the FAA," id. at 592.[9] If the FAA were, in all circumstances, the exclusive grounds for review of arbitration awards subject to the FAA, these possible alternative paradigms of judicial review that the Court described would have been completely foreclosed. Indeed, the Texas Supreme Court has specifically recognized the limited applicability of the FAA to state courts: "The mere fact that a contract affects interstate commerce, thus triggering the FAA, does not preclude enforcement under [state law] as well." Nafta Traders, Inc. v. Quinn, 339 S.W.3d 84, 98 (Tex. 2011).

Here, the FAA applied to the extent that it required the parties to arbitrate their dispute, as the trial court noted when it referred Finn's claim to the second arbitration panel. That does not mean that all aspects of the FAA are applicable to this proceeding. Based upon our review of the pertinent case law, we conclude that neither Hall Street, nor any other precedents by which we are bound, requires that we accept plaintiff's position that §§ 10 and 11 provide the exclusive grounds for state court review of arbitration awards subject to the FAA.

We next consider Finn's argument that so-called "obstacle preemption" supports her assertion that RSA 542:8 is invalidated by the FAA. The "obstacle" branch of conflict preemption requires more than a showing that some tension between the state and federal laws exists. Exxon Mobil Corp.,

---

[9] It must be noted that the arbitration agreement at issue in Hall Street was not, as here, one contained in the agreement that was the genesis of the underlying dispute between the parties. Rather, it was a separate agreement to arbitrate a particular issue (indemnification) that was entered into by the parties after a lawsuit had already been filed in federal district court and after the case had been partially resolved (as to other issues) by that court. See Hall Street, 552 U.S. at 579. The fact that the parties were already in federal court when they agreed to arbitrate appears to be what caused the Court to opine that when the case arrived at its doorstep, "no reason then appeared for treating [it] as anything but an FAA case," and to note, "[n]or is there any doubt now that the parties at least had the FAA in mind at the outset." Id. at 590. Because the dispute was already before a federal court when the parties agreed to arbitrate, it was quite natural for the courts, including the Supreme Court, to treat the agreement as contemplating that any judicial review of that agreement would take place in federal court, and thus be subject to §§ 10 and 11 of the FAA. In this case, by contrast, the arbitration occurred pursuant to the terms of the Agreement, which was entered into long before there was any extant dispute between the parties, let alone one that had invoked the jurisdiction of a particular court.

168 N.H. at 229-30.  A party must show that "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together."  Id. (quotation omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  Crosby v. National Foreign Trade Council, 530 U.S. 363, 373 (2000).

The Supreme Court has provided guidance regarding the purpose of the FAA.  It has described the primary purpose of the FAA as "foreclos[ing] state legislative attempts to undercut the enforceability of arbitration agreements."  Southland Corp., 465 U.S. at 16.  This purpose is rooted in § 2 of the FAA.  Id. at 10.  By establishing that agreements to arbitrate "shall be valid, irrevocable, and enforceable," 9 U.S.C. § 2, Congress "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."  Southland Corp., 465 U.S. at 10.  For example, the Court held preempted a state law that required notice of an arbitration clause upon the first page of the contract, Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 683 (1996), and a law that required administrative procedures before a case could proceed to arbitration, Preston v. Ferrer, 552 U.S. 346, 349-50 (2008).  Thus, at the heart of the Court's FAA preemption doctrine is its effort to enforce Congressional intent by thwarting the recurring refusal of state courts to enforce an otherwise valid contract because it embodied the parties' agreement to arbitrate.  See Southland Corp., 465 U.S. at 16.  In short, preemption under the FAA is at its apex when parties cannot get to arbitration because state law attempts to force them to resolve their dispute in court.  See id.

In AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 338 (2011), the Court considered California's application of the doctrine of unconscionability to an arbitration agreement.  AT&T Mobility, 563 U.S. at 338.  The California law held unconscionable arbitration agreement provisions that waived class proceedings — both in litigation and arbitration — if the state court found that bilateral proceedings would not adequately substitute for the deterrent effect of a class action.  Id.  The Court had to decide whether the FAA preempted the California law, which was generally applicable but was "alleged to have been applied in a fashion that disfavors arbitration."  Id. at 341.  In reaching its conclusion, the Court emphasized that "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."  Id. at 344.  Reiterating that "our cases place it beyond dispute that the FAA was designed to promote arbitration," the Court examined whether the California rule "interferes with arbitration."  Id. at 345-46.  It concluded that, by requiring that class actions be available in a particular subset of arbitration agreements, California courts had "sacrifice[d] the principal advantage of arbitration—its informality."  Id. at 348.  Class arbitrations take more time to reach a final award on the merits than bilateral arbitration and require procedural formality to make the award

binding upon absent parties.  Id. at 348-49.  These complications, the Court determined, departed significantly from arbitration as envisioned by the FAA and, therefore, were a thinly veiled refusal to enforce arbitration agreements.  Id. at 351.  The California rule was therefore preempted because it required drastic procedural changes before the court would enforce the agreement to arbitrate.  Id. at 351-52.

In contrast, state rules that slow or change procedures without the potential consequence of invalidating an arbitration agreement are not preempted.  In Volt, the Court considered whether the FAA preempted a state court from interpreting a choice-of-law provision as applying state procedural rules.  Volt, 489 U.S. at 470, 477-78.  The state procedure that the trial court applied stayed the arbitration when the FAA would not, thus delaying the arbitration.  Id. at 471-72.  The Court recognized that "Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes," but declined to accept expeditious review as a primary goal of the FAA.  Id. at 478-79.  Rather, it reasoned that "[t]he FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate."  Id. at 478 (quotation omitted).  The Court explained that Congress "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered."  Id. (quotation omitted).  Although the Court had held preempted state laws that required judicial resolution of claims despite parties contracting to resolve them by arbitration, it distinguished the FAA's procedural rules: "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  Id. at 476.

The fact that a state law affecting arbitration is less deferential to an arbitrator's decision than the FAA does not create an obstacle so insurmountable as to preempt state law.  Volt demonstrates that not all obstacles to arbitration are repugnant to the FAA.  The procedural rule in Volt delayed arbitration, and simplified it, by staying the proceedings until non-arbitral issues had been resolved.  Id. at 471.  On the other hand, the state rule at issue in AT&T Mobility contemplated an extreme alteration of arbitration procedure, risks, and efficiency, and failure to comply with its requirement would make the agreement to arbitrate unenforceable.  AT&T Mobility, 563 U.S. 348-49.  It thus had such a profound effect upon arbitration as to effectively deter parties from choosing arbitration.

RSA 542:8 is more like the rule at issue in Volt than that at issue in AT&T Mobility.  "[T]he FAA does not preempt all state-law impediments to arbitration; it preempts state-law impediments to arbitration agreements."  Nafta Traders, 339 S.W.3d at 100.  Thus, "[f]or the FAA to preempt [state law], state law must refuse to enforce an arbitration agreement that the FAA would enforce."  Id. at 98 (quotation omitted).  RSA 542:8's more rigorous standard of judicial review of arbitral decisions is not an impediment to enforcement of the

10

parties' <u>agreement to arbitrate</u> as per the terms of the Agreement. In fact, it does not even slow the enforcement of an agreement to arbitrate, but instead applies <u>after</u> an agreement to arbitrate has already been enforced, arbitration conducted, and a final award issued. It allows the trial court to ensure that no plain mistakes made by the arbitrators will go uncorrected.

In this case, the trial court did not refuse to enforce the parties' agreement to arbitrate. Instead it applied RSA 542:8 to review the second panel's award, which was produced because the trial court had complied with the FAA and enforced their agreement to arbitrate. RSA 542:8 does not interfere with the FAA's principal purpose of protecting arbitration agreements from perceived judicial hostility. Because our state standard of review does not impede the enforcement of an arbitration agreement nor mandate drastic changes to the procedures by which arbitration is to be conducted, it is not preempted by the FAA.

Finn nonetheless insists that the Court's discussion in <u>Hall Street</u> about the dangers of "full-bore legal and evidentiary appeals that can render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process," thus "bring[ing] arbitration theory to grief in postarbitration process," <u>Hall Street</u>, 552 U.S. at 588 (quotation and brackets omitted), demands that we hold RSA 542:8 preempted by the FAA. She argues that, although the Court acknowledged that parties may seek review of arbitral decisions through other avenues of enforcement, these "are only permissible where they are <u>more restrictive</u> than federal standards of review." <u>See</u> <u>Hall Street</u>, 552 U.S. at 584, 590-92. We do not believe that <u>Hall Street</u> stands for this proposition.

In <u>Hall Street</u>, the Court considered whether §§ 10-11 of the FAA prevented a federal court from "enforcing a contract to expand judicial review." <u>Id</u>. at 586. After commencing complex litigation in federal court, the parties agreed to submit one of the claims to arbitration. <u>Id</u>. at 579. Their arbitration agreement granted the trial court the authority to review the arbitrator's findings of fact and conclusions of law. <u>Id</u>. Following the arbitration, one of the parties moved to vacate the award for legal error, and the trial court granted such relief. <u>Id</u>. at 580. On appeal, the Supreme Court concluded "that §§ 10 and 11 respectively provide[d] the FAA's exclusive grounds for expedited vacatur and modification." <u>Id</u>. at 584. The Court rejected the argument that allowing for expanded judicial review was consistent with the FAA's primary purpose of enforcing the parties' agreements. <u>Id</u>. at 586. It explained that "to rest this case on the general policy of treating arbitration agreements as enforceable as such" was at odds with what it found to be the exclusiveness language used in §§ 10 and 11. <u>Id</u>. Therefore, the parties could not contract to expand the scope of review applied to the award under the FAA because "it makes more sense to see the three provisions . . . as substantiating a national policy favoring arbitration with just the limited review needed to maintain

11

arbitration's essential virtue of resolving disputes straightaway." Id. at 588. But the Court limited the reach of this national policy:

> In holding that §§ 10 and 11 provide exclusive regimes for the review provided by the statute, we do not purport to say that they exclude more searching review based on authority outside the statute as well. The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable. But here we speak only to the scope of the expeditious judicial review under §§ 9, 10, and 11, deciding nothing about other possible avenues for judicial enforcement of arbitration awards.

Id. at 590.

Accordingly, Hall Street does not support Finn's contention that the Court has held preempted state standards of review that are more rigorous than the FAA. Instead, the caveat of Hall Street supports our conclusion that RSA 542:8 is not preempted. Hall Street was a question of statutory interpretation, not preemption. See id. at 586-88. It considered only federal law as it applied to a federal court. Although it based its conclusions upon a "national policy," id. at 588, it did not do so in the context of a state law. Not only did the Court recognize that other statutes existed that would conflict with the Court's interpretation of the FAA, it suggested that such avenues remained open to parties, even after its decision. Thus, it implied that although "more searching review," id. at 590, was in conflict with the "national policy favoring arbitration with just limited review," the conflict may not effectively preempt such avenues of review. Id. at 588.

The California Supreme Court reached a similar conclusion when it considered whether its rule allowing parties to expand judicial review by contract was preempted in the aftermath of Hall Street:

> Nevertheless, we do not believe the Hall Street majority intended to declare a policy with preemptive effect in all cases involving interstate commerce. Hall Street was a federal case governed by federal law; the court considered no question of competing state law. It reviewed the application of FAA provisions for judicial review that speak only to the federal courts. The court unanimously left open other avenues for judicial review, including those provided by state statutory or common law. While the court, of course, decided nothing about the viability of these alternatives, their mention in the majority opinion indicates that Hall Street's holding on the effect of the FAA is a limited one.

Cable Connection, Inc. v. DIRECTV, Inc., 190 P.3d 586, 599 (Cal. 2008) (citation omitted).  We agree with the California court.  To conclude from Hall Street that the Court intended to establish a new policy with preemptive effect is unreasonable given both the context and express limitation of the case's holding, as well as the federalism concerns that would be implicated by such a broad reading of the case.

Here, the Agreement included a choice-of-law clause, and Finn and the other shareholders selected New Hampshire law as the governing law: "This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Hampshire, without regard to conflict of laws principles."  Their choice to govern their agreement by New Hampshire law includes the agreement to arbitrate; the arbitration clause does not reference the use of any other governing law.  The parties opted for judicial review through a mechanism other than the FAA, an avenue left undisturbed by the Court in Hall Street.  See Hall Street, 552 U.S. at 590.  By applying RSA 542:8 to the arbitral award, the trial court was faithful to the parties' intent.  Not only does Hall Street contemplate the possibility of such an outcome, enforcing parties' agreements according to their terms remains at the heart of the FAA.  AT&T Mobility, 563 U.S. at 339 ("[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." (citations omitted)).  We therefore conclude that the FAA does not preempt RSA 542:8, and that the trial court did not err by applying it to the second arbitral award.

B

Finn next argues that the trial court erred because it did not give deference to the second panel's findings of fact and rulings of law.  She contends that the trial court erred by failing to accept the second panel's finding that Finn could not have brought her unjust enrichment claim in the first arbitration.  She also contends that the trial court was entitled to vacate the second panel's award for mistake of law only if it found that the panel did not know what the law was.  We are not persuaded by these arguments.

We have construed RSA 542:8 to grant the trial court the power to vacate an arbitration award for a "plain mistake" of law or fact.  Walsh v. Amica Mut. Ins. Co., 141 N.H. 374, 375 (1996).  "It must be shown that the arbitrators manifestly fell into such error concerning the facts or law, and that the error prevented their free and fair exercise of judgment on the subject."  Merrill Lynch Futures v. Sands, 143 N.H. 507, 509 (1999).  We therefore consider arbitral awards with deference to the arbitrators.  Id.  In past cases we have defined a "plain mistake" as "an error that is apparent on the face of the record and which would have been corrected had it been called to the arbitrators' attention."  Id. (quotation omitted).  Although we have recited this language, we have reversed arbitration awards when the errors, although not subtle, were

13

not so obvious as to satisfy the literal meaning of this language. Indeed, we have found plain mistake in circumstances where the correct legal analysis was presented to the arbitrator(s) but was rejected. See Sherman, 152 N.H. at 121-23 (reversing when parties disputed before arbitrator whether contract language was ambiguous, arbitrator found language ambiguous, and we disagreed); John A. Cookson Co. v. N.H. Ball Bearings, 147 N.H. 352, 361-62 (2001) (reversing arbitrator who did not award interest when the parties' arbitration agreement did not contain a provision for the payment of interest on damages because we concluded that, given the "broad language" of the agreement, "the arbitrator could have awarded interest"); Walsh, 141 N.H. at 375-76 (reversing arbitration panel that found plaintiff's injuries arose out of the use of a motor vehicle because although the operator used the vehicle in a sense, we held it was not a normal use and "any connection to the plaintiff's injuries [was] too tenuous").

The trial court did not misapply the standard of review for an arbitration panel's findings of fact because it did not upset the second panel's findings as to any factual issues. The panel asked the parties to brief whether Finn "[c]ould and therefore should . . . have . . . advanced a claim for unjust enrichment in [the first] action and if she did not, is she foreclosed from advancing such a claim . . . in the current action." This question is, in essence, merely a rephrasing of the doctrine of res judicata, which is an issue of law. Sleeper v. Hoban Family P'ship, 157 N.H. 530, 533 (2008). Therefore, we consider the question by applying the standard for plain mistakes of law.

A trial court may vacate an award for plain mistake of law under two circumstances. First, the court may find a plain mistake of law when the law has changed after the issuance of an award, but before the award is reduced to final judgment, if the court concludes that the panel would not have reached the same conclusion had it known of the change in the law. N.H. Ins. Co. v. Bell, 121 N.H. 127, 129 (1981). Second, the court may find a plain mistake of law when the panel clearly misapplied the law to the facts. Sherman, 152 N.H. at 120-23 (reviewing the language of a contract de novo and concluding that the panel erred when it considered extrinsic evidence because the contract was not ambiguous); see also Turcotte v. Griffin, 120 N.H. 292, 294-95 (1980). RSA 542:8 does not require, as Finn contends, a scouring of the record for proof as to the panel's understanding of general legal principles that may be pertinent to the issues before it. Nor must it assume proper application of the law from the panel members' resumes. Rather, although judicial review is deferential, it is the court's task to determine whether the arbitrators were plainly mistaken in their application of law to the specific facts and circumstances of the dispute they were called upon to decide.

Although Finn relies upon Walsh to support her claim that the panel committed no plain mistake of law, that case actually supports the trial court's ruling in this case. See Walsh, 141 N.H. at 375-76. In Walsh, an arbitration

14

panel found that Walsh's uninsured motorist coverage required his insurer to cover the injuries he sustained as a result of being shot while he sat in his car. Id. at 374-75. We reversed the trial court's confirmation of the award because the panel committed a plain mistake when it concluded that Walsh's injuries arose from the use of an uninsured car. Id. at 375-76. We identified the applicable law: "To warrant coverage, then, there must be more than a tenuous connection to the automobile; the [uninsured] operator must have been using his vehicle or behaving as a motorist at the time the plaintiff was injured." Id. at 375 (quotation omitted). We then applied the law to the facts: "Though [the gunman] apparently 'used' the vehicle to steady his gun on the windshield, this is not a normal use for which a vehicle is intended; consequently, any connection to the plaintiff's injuries is too tenuous to warrant coverage." Id. at 375-76. It was the obvious misapplication of law to the facts that led us to comment that "[t]o the extent the arbitrators believed the law to be otherwise, they were plainly mistaken," and it was this misapplication of the law that led to our vacating the arbitral award. Id. at 376.

The trial court in the instant case treated the second panel's award with the same degree of deference that we employed in Walsh. It thoroughly described the law of res judicata and, as we discuss below, correctly applied that law to the record before it. Thus, we reject Finn's contention that the trial court misapplied the plain mistake standard by conducting an overly searching review of the panel's decision.

C

Finn asserts that the trial court erroneously applied res judicata because her second action arose from a separate transaction that occurred after the first arbitration and relied upon different material facts. Therefore, she reasons, she could not have brought her unjust enrichment claim in the first arbitration because "the damages sought in the second action could not have been requested in the first action."

The doctrine of res judicata "prevents parties from relitigating matters actually litigated and matters that could have been litigated in the first action." Merriam Farm, Inc. v. Town of Surry, 168 N.H. 197, 199 (2015). "[I]t applies if three elements are met: (1) the parties are the same or in privity with one another; (2) the same cause of action was before the court in both instances; and (3) the first action ended with a final judgment on the merits." Id. (quotation omitted).

Finn asserts only that her second arbitration did not involve the same cause of action as the first arbitration; she does not dispute that the first and third elements of res judicata are satisfied. Therefore, we consider only whether Finn's unjust enrichment claim based upon the denial of "Claw Back"

15

benefits constitutes the same cause of action as her first claim based upon her wrongful termination.

A "cause of action" is "the underlying right that is preserved by bringing a suit or action." In re Estate of Bergquist, 166 N.H. 531, 535 (2014) (quotation omitted). It encompasses "all theories upon which relief could be claimed on the basis of the factual transaction in question." Id. (quotation and brackets omitted). Thus, if several theories of recovery arise out of the same transaction or occurrence, they amount to one cause of action.

Finn argues that her wrongful termination and the sale of her stock to Perspecta are separate transactions entitling her to two separate actions for damages. However, Finn defines "transaction" too narrowly. "[T]ransaction," for the purposes of res judicata, is used in a broad sense and "the overtones of voluntary interchange often associated with the term in normal speech do not obtain." Restatement (Second) of Judgments § 24 cmt. b at 199 (1982). Instead, we use "transaction" to describe factual occurrences that can be grouped together naturally or that share operative facts. Id. Several factors help us to determine whether two actions arise from the same factual occurrence: "their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." Id.

In this case, the first arbitration and the second arbitration are tied together by their origin. The second panel's own conclusions demonstrate the intertwining of Finn's first and second actions:

> The Respondents terminated her for no cause and by doing so created the very circumstance in which her stock could not be purchased "pursuant to" the Shareholder Agreement or at a price calculated "under Section 7." As a result of their wrongful conduct, Finn's contractual "Claw Back" rights were lost.

Finn's second action was not based upon a new factual occurrence, but upon the continuing injury of her termination. Furthermore, substantial overlap exists between the material facts in the first arbitration and the material facts in the second arbitration, making the claims a convenient trial unit. Finn claims that the material facts are the "quick resale of [her] stock at a higher price," but these facts do not exist without Finn's wrongful termination and forced sale of her stock, which resulted in a substantial award against BFI and caused Ballentine & Co. to sell her shares, at least in part, to fulfill the judgment. In both arbitrations, Finn's claim depended upon the same evidence of BFI's wrongful conduct. In fact, the only additional evidence was the value of the newly discovered damage — BFI's additional profit — which Finn sought in the second action. The second arbitration could not have succeeded without the material facts of the first arbitration. It was based upon additional damages arising out of the same wrongful conduct — her termination.

Finn also argues that she could not have requested unjust enrichment damages in the first action because she did not know that the claim existed until BFI resold her stock. However, res judicata precludes a second action based upon the same factual occurrence even if the plaintiff plans to seek remedies she did not assert in the first action. Restatement (Second) of Judgments § 25, at 209. Like the trial court, we find the Restatement instructive:

> Typically, even when the injury caused by an actionable wrong extends into the future and will be felt beyond the date of judgment, the damages awarded by the judgment are nevertheless supposed to embody the money equivalent of the entire injury. Accordingly, if a plaintiff who has recovered a judgment against a defendant in a certain amount becomes dissatisfied with [her] recovery and commences a second action to obtain increased damages, the court will hold [her] precluded; [her] claim has been merged in the judgment and may not be split. . . . It is immaterial that in trying the first action [s]he was not in possession of enough information about the damages, past or prospective, or that the damages turned out in fact to be unexpectedly large and in excess of the judgment.

Id. § 25 cmt. c at 211 (emphasis added).

Both the first and second panels found that Finn was denied the benefits of the Agreement by BFI's wrongful conduct. The first panel crafted a remedy for the fair value of her shares in BFI, taking into account all of the benefits she had been denied. The second panel found that one of the benefits which Finn was denied was the right to claim additional profits if, after selling her shares to BFI, they were resold within a certain time. Because "Finn's original claims resolved by the first arbitration panel . . . did not include any claim involving or relating to the 'Claw Back' provision of the Shareholder Agreement," the panel concluded that "Finn [was] not precluded by reason of [r]es judicata . . . from advancing her claims associated with the 'Claw Back' provision in the [second] arbitration proceeding." However, the loss of this benefit was an injury caused by the same wrongful conduct that the first panel remedied, and the first award should have embodied its value. It is irrelevant to the application of res judicata that Finn did not expect BFI to be able to liquidate her shares or make a profit from their sale. She knew that her termination was outside the confines of the Agreement and that she was effectively losing the benefits of certain provisions of the Agreement, including the "Claw Back" provision. Even though she did not know that BFI would resell her shares and, if they did, what the profit would be, she could have asked the panel to craft a contingent remedy.[10] Though the value of the

---

[10] The first panel demonstrated that such contingent awards were possible when it ruled that the

17

damages was uncertain, the wrongful conduct that entitled Finn to claim unjust enrichment existed at the time of the first arbitration.

The second panel should have applied res judicata to bar Finn's second action. The panel acknowledged that the denial of benefits was based upon the same injury to Finn that was the subject of the first arbitration. Given its findings, it should have concluded that the action arose from the same factual occurrence and merely sought additional damages for the same injury. The record cannot support any other determination than that res judicata barred Finn's unjust enrichment claim. The second panel therefore committed a plain mistake, and the trial court did not err when it vacated the second panel's final award.

III

For the reasons stated above, the judgment of the superior court is hereby affirmed.

Affirmed.

DALIANIS, C.J., and HICKS, J., concurred.

---

two final installment payments paid to Finn would be "either 1.4 million dollars, or 14% of Ballentine, Finn & Company, Inc.'s gross revenues, whichever is higher." Similarly, the first panel could have added a contingent remedy for the possible sale of shares.